UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEBA ABDELAAL,<br><br>        Plaintiff,<br><br>              v.<br><br>THE CITY OF NEW YORK, OFFICE OF THE BRONX DISTRICT ATTORNEY, DARCEL D. CLARK, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS AN EMPLOYEE OF THE DEFENDANT OF THE CITY OF NEW YORK, AND BRONX COUNTY,<br><br>        Defendants. | ECF CASE<br><br>No.:_____<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1.      Plaintiff Heba Abdelaal ("Plaintiff") alleges claims of sexual harassment, religious discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII"), New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL").

## THE PARTIES

2.      Plaintiff was, at all relevant times, an adult female of the Muslim faith, residing in Staten Island, New York, Richmond County.

3.      Defendant The City of New York ("City") is a municipal corporation organized under and by virtue of the laws of the State of New York. Pursuant to Chapter 16 § 396 of the Charter of the City of New York, all actions against the agencies or elected officers of the City shall be brought in the name of the City.

4.      Defendant Office of the Bronx District Attorney ("Bronx DA") is a New York City law enforcement agency with its principal offices located at 198 East 161st Street, Bronx, New York 10451.

5.      Defendant Darcel D. Clark is an employee of the City of New York and the Office of the Bronx District Attorney. She is sued individually and in her official capacity as an employee of the City of New York.

<u>JURISDICTION, VENUE AND EXHAUSTING ADMINISTRATIVE REMEDIES</u>

6.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1337, 1343, and supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims under 28 U.S.C. § 1367.

7.      Venue is proper in this District under 28 U.S.C. §§1391(b)(1), 1391(b)(2): a substantial part of the events giving rise to the action occurred in this District; and Defendants are resident in this District.

8.      This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

9.      On June 11, 2020, Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission and on August 27, 2020 the EEOC issued her a Notice of Right to Sue.

10.      On June 12, 2019, Plaintiff served a written Notice of Claim upon Defendants, within 90 days from the date that the claims alleged herein arose, pursuant to Gen. Mun. Law § 50.

11.     At least 30 days have passed since the Notice of Claim, containing the claims alleged herein, was presented to Defendants and they have neglected or refused to make any adjustments or payments.

12.     This action is commenced within one year and 90 days from the date when the occurrences and the causes of action alleged herein arose, and are therefore timely filed.

<u>STATEMENT OF FACTS</u>

13.     Plaintiff commenced her employment with the Bronx DA in January 2019 as an Assistant District Attorney ("ADA").

14.     Throughout her employment, Plaintiff has worked in the Child Abuse & Sex Crimes Unit ("CASC"), which is a sub-unit of the Special Victims Unit.

<u>Sexual Harassment</u>[1]

15.     The Bronx DA's work environment is rampant with unlawful harassment, which goes unchecked and where the victims are retaliated against when they reject and complain about being sexually harassed by their supervisors and colleagues.[2]

16.     Throughout her employment at the Bronx DA, Anthony Perrotto, a Felony Assistant, who also acted in a supervisory role to Plaintiff, has sexually harassed Plaintiff on numerous occasions.

---

[1] Headers are included for organizational purposes only.
[2] https://www.nydailynews.com/new-york/ny-metro-bronx-da-clerk-alleges-retaliation-sexual-harassment-20190121-story.html (last visited Oct. 29, 2020);
https://nypost.com/2020/10/18/bronx-prosecutor-claims-da-ignored-her-rape-sex-assault/ (last visited Oct. 29, 2020).

17.     In March and April 2019, Perrotto sexually harassed Plaintiff while she was shadowing him for work, the following of which are representative examples:

a.   He showed her pictures of a defendant's penis, including one which he referred to as the "Micro Penis."

b.   He repeatedly commented on her breasts and informed her that he believed they were big.

c.   He repeatedly asked her why she wore loose shirts, which did not "show [her] breasts."

d.   He told her "if you keep having sex with police officers, you will have lacerations on your vagina," after finding out that certain police officers were asking for her phone number.

e.   He asked Matthew Barlow, an arresting officer with whom Plaintiff works, what he thought about her breasts.  He, thereafter, looked Barlow up on Facebook and suggested that Plaintiff "get to know him" – implying they should have sexual relations. This surprised Plaintiff because she never dated a police officer with whom she worked nor did she ever have sexual relations with anyone from work.

18.     Plaintiff discussed the aforementioned conduct with Hiba Abdullah, a Muslim TPA, immediately following these incidents. However, Plaintiff did not file any formal complaints regarding this conduct for fear of retaliation because she had only recently begun her employment with Defendants, and Perrotto was responsible for Plaintiff's orientation and training.

19.     Perrotto told Plaintiff in front of Barlow that he was permitted to make sexually inappropriate comments to her because he was a homosexual.

20.     Plaintiff told another ADA about Perrotto's inappropriate behavior, to which she responded that "it is just the environment here, it is a joke, [if you can't handle it,] maybe you shouldn't work here."

21.     As a result of these occurrences, and in an attempt to stop Perrotto's comments, Plaintiff began to isolate and distance herself from Perrotto and her other colleagues.

22.     After Plaintiff rejected Perrotto's behavior, Defendants retaliated against her by engaging in a pattern of hostile behavior towards her.

23.     Defendants treated Plaintiff differently than her ADA coworkers, the following of which are representative examples:

      a.  She was the only ADA in the CASC unit who was required to have her work reviewed by another ADA.

      b.  She was the only ADA in the CASC unit who was not permitted to bring Trial Prep Assistants ("TPA") with her when she worked "in the field."

      c.  She was the only ADA in the CASC unit who was only permitted to work with one supervisor when "conferencing cases," even though that supervisor had limited availability.

      d.  She was the only ADA in the CASC unit who was not permitted to assign discovery-related assignments to TPA's.

      e.  She was the only ADA in the CASC unit who was required to learn how to use certain computer systems.

24.    On May 8, 2019, Plaintiff's Bureau Chief, Rachel Ferrari, who had a close relationship with Perrotto, asked to speak to Plaintiff concerning her "changed demeanor." Ferrari told her that "[she's] been told" that Plaintiff "has become abrasive." In fact, Plaintiff had simply chosen to work with her office door closed, in an attempt to shield herself from the inappropriate comments and conduct to which she was subjected throughout her employment. ADA Tiffany Ould also discussed Perrotto calling Plaintiff abrasive with Plaintiff. During this conversation, ADA Ould mispronounced Plaintiff's Muslim name. When Plaintiff simply corrected her, ADA Ould responded, "see that's abrasive."

25.    Ferrari then further berated Plaintiff for taking time off of work to go to her sister's basketball game, notwithstanding that her supervisor, Alexandra Militano, had approved her time off. She then accused Plaintiff of being "unethical" for leaving a voluntary Continuing Legal Education Course early, notwithstanding that she left early because she was sick and informed those in charge of the course that she left early—she had not certified attending the full course.

26.    On May 8, 2019, after her meeting with Ferrari, Plaintiff informed Ferrari via email that some of her colleagues were treating her disrespectfully, including ADA Ould calling Plaintiff abrasive for correcting the pronunciation of her name, and Perrotto repeatedly telling Plaintiff that she did not belong in the CASC unit, suggesting that because of her religion she was too sensitive for the offices' hostile work environment. Ferrari dismissed her concerns and instead stated "come on Heba, you wanna file a report for bullying?" – implying that she was overreacting and that there was no need to investigate her complaints any further.

27.    Plaintiff informed Ferrari that, due to Ferrari's response to her previous concerns, she would not be comfortable going to Ferrari with any further concerns or complaints.

28.    On May 14, 2019, Plaintiff informed her TPA, Steinhardt, that she found it difficult to locate her during the workday and that there were some serious errors in her work. Steinhardt, in response, began yelling, blocked Plaintiff's office door, and asked that Plaintiff not raise these issues with her supervisor. Instead of addressing Steinhardt's inappropriate behavior towards Plaintiff, Ferrari removed her as Plaintiff's assistant.

29.    In June or July 2019, Militano (Supervisor) and Johanna Hernandez (Deputy Chief) informed Plaintiff that she could wear certain shoes to work for medical reasons. Ferrari, nevertheless, made repeated comments to her that her shoes were not professional and that she should wear closed-toe shoes to work. This surprised Plaintiff because some of her colleagues, who had neither medical conditions nor approved accommodations, wore yoga pants and flip-flops to work without reprimand. Plaintiff, thereafter, provided documentation to Muroff (Division Chief) regarding her requested accommodation and he approved her request to wear certain open-toed shoes to work. Ferrari, however, continued to direct her to wear "professional shoe wear.

30.    In July 2019, ADA Serena Newell informed Plaintiff that she was assigned to be her "mentor." No other ADA in the CASC unit was assigned a mentor.

31.    On July 12, 2019, Plaintiff's new TPA, Vanessa, falsely accused Plaintiff of threatening a witness with deportation. Plaintiff informed Ferrari of the false accusation and that she could not have threatened the witness with deportation because the witness

had no immigration issues. Ferrari, nevertheless, threatened to remove her from the CASC Unit if there were any other complaints made about her.

32.     On July 13, 2019, Ferrari accused Plaintiff of failing to refer a victim to the DA's Crime Victims Services. Plaintiff informed her that she had referred the victim to both the Crimes Victims Services and to Adult Protective Services. Instead of acknowledging that she falsely accused Plaintiff, Ferrari responded that she "did not want to hear any fact specific information," and accused Plaintiff of being argumentative.

33.     On August 9, 2019, the Division Chief, Joseph Muroff, and Ferrari informed Plaintiff that she would no longer be assigned a TPA because she had allegedly caused issues with both Steinhardt and Vanessa. Plaintiff informed them that she was not the root of the issue, but rather her assistants, as well as other assistants in her unit, disrespected her and one assistant often called her a "bitch" or an "asshole." Ferrari dismissed these allegations and told Plaintiff that she was exaggerating.. Muroff then instructed Ferrari to "handle the matter," but she never did. Plaintiff became the only ADA who was not assigned a TPA, despite being assigned over 50 cases in the CASC unit and handling misdemeanor complaints in the Human Trafficking Unit.

34.     In August 2019, Plaintiff asked to speak with Muroff, without Ferrari present, to discuss the behavior and retaliation within her unit. Muroff declined to speak to Plaintiff at this time.

35.     In August 2019, Plaintiff met with the Bronx DA's EEO Officer and complained about being sexually harassed by Perrotto and retaliated against for rejecting Perrotto's sexual harassment of her. Furthermore, Plaintiff also complained about her continued mistreatment by her supervisor.

36.     On August 12 or 13, 2019, rather than take Plaintiff's complaint seriously and conduct a prompt investigation, the EEO Officer informed Plaintiff that it would be best for her career if she did not file a formal complaint with the EEO because the EEO Officer believed she would be transferred out of the Special Victims Unit if she did—effectively a demotion. The EEO Officer stated that Plaintiff was within her rights to file a complaint but asked Plaintiff where she wanted to take the complaint, informing her that nothing beneficial would result from it. The EEO Officer further informed Plaintiff that complaints of this nature were typically resolved by removing the reporter and not the offender, as there are a lot of bad actors so it is simply easier to transfer those complaining about the conduct. Plaintiff never received any indication that any action would be taken to stop the bad behavior that gave rise to Plaintiff's complaint.

37.     In approximately October 2019, an intern informed Plaintiff that Perrotto and another ADA were kicking and ripping Halloween decorations off of Plaintiff's office door.

38.     In October 2019, ADA Insignia "warned" a legal intern, Amanda Vega, about the Plaintiff, instructing Intern Vega not to shadow Plaintiff because Plaintiff had a reputation. ADA Insignia also mentioned to another ADA that Plaintiff was on Ferrari and Muroff's "troubled list."

39.     In or about October 2019, Perrotto posted a picture on Facebook with Baer (Supervisor), demonstrating that the two had a close relationship. Although Baer was Plaintiff's supervisor, Plaintiff would never be comfortable bringing complaints about Perrotto to Baer due to the close relationship between the two of them.

40.     In October 2019, Baher and Perrotto (who had an indicia of intoxication) informed Plaintiff that she should not sit on a couch in Ferrari's office because there was semen on it from ADA Vega having sex with multiple ADAs.

41.     Plaintiff was not the only individual to notice Perrotto's erratic behavior and an indiciua of intoxication. Plaintiff was present when an NYPD officer also informed Perrotto that he had the "indicia of intoxication."

42.     On October 7, 2019, Hernandez (Deputy Chief) met with Plaintiff to discuss a comment she made to Perrotto, in which she inquired whether there was alcohol in his drink. She informed Hernandez that she did not mean to insult him, but only asked him "what was in his drink" because she believed he was intoxicated based on his erratic behavior and unsteady gait and he also told her that he "had an indicia of intoxication." She then informed Hernandez about being sexually harassed by Perrotto. Hernandez did not investigate Plaintiff's claims any further.

43.     After Plaintiff complained about Perrotto's behavior to Hernandez, Defendants retaliated against her by engaging in a pattern of hostile behavior towards her.

44.     On October 30, 2019, a legal intern informed Plaintiff that Perrotto made a joke about Plaintiff in front of her supervisors and stated that she did not belong in the CASC Unit.

45.     About one week later, Ferrari accused Plaintiff of "lashing out," referring to Plaintiff's earlier question to Perrotto concerning what he was drinking, which was prompted by Perrotto's erratic behavior. This struck Plaintiff as odd given the lack of sensitivity with comments that was continually displayed by Perrotto, of which several supervisors, including Ferrari, were aware.

46.     On or about November 4, 2019, Ferrari told Plaintiff that she may not be "fit" to work in the Special Victims Unit because Plaintiff herself was a victim of domestic violence, notwithstanding that the Bronx DA has no such policy or practice.

47.     On December 12, 2019, at the office Christmas party, Plaintiff observed Perrotto grab a non-legal TPA's, Jason Singer, penis and motion his head in a way to give the appearance that he was giving him oral sex. She then saw Perrotto grab and squeeze a Felony Assistant's, Stephanie Baher, breasts, and then unzip her shirt. He then asked Plaintiff "if [she] like[s] penis," after which Baher grabbed her by the buttocks. Plaintiff also saw an employee grab Deputy Chief Danielle Pascale's hair in a flirting way.

48.     On December 13, 2019, Plaintiff reported the December 12 incidents to Pascale. She, thereafter, met with Muroff (Division Chief) and Derek Lynton (Chief ADA) and again reported the prior night's harassment and hostile work environment.  Lynton told Plaintiff "I know you work in an unhealthy work environment," and stated  that he "would look out for [her]." They did not investigate Plaintiff's claims further, or take any corrective action against Perroto, but instead told her that she should "just transfer" to a different unit for a period of one year until the conduct and complaints dissipated.  In fact, despite her complaints, Baher continued to work with her.

49.     On December 14, 2019, Plaintiff sent Lynton an email explaining that she did not want to transfer to a different unit.

50.     On December 14, 2019, Plaintiff filed a formal complaint with the Bronx DA's EEO about the sexual harassment and retaliation she endured.

51.     On January 23, 2020, two EEO Officers interviewed Plaintiff concerning her sexual harassment and retaliation complaint.

52.     After Plaintiff filed a complaint with the EEO, Respondents continued to retaliate against her by acting in a hostile manner towards her.

53.     For example, in January 2020, during training for a new Criminal Reform, Defendants scheduled Plaintiff to work nights and weekends, and only assigned her to work two "office days" over the course of three weeks, making it difficult for her to complete her assignments. All other ADA's in the CASC unit that started working at the same time as her were assigned 8 or 10 "office days" over the course of three weeks, which was consistent with the Bronx DA's policy of assigned ADA's to work nights or weekends, on a rotating basis.

54.     Ferrari also spoke to the TPAs assigned to Plaintiff, and told them that if there was one more complaint about Plaintiff, that Plaintiff would lose her TPA. However, Plaintiff was the one being subjected to improper conduct and filing the complaints.

55.     On January 6, 2020, Plaintiff was working with Detective Inspector Clayton on a re-arrest. After seeing Plaintiff and Clayton working together, two ADAs approached Clayton to inquire and insinuate that a sexual relationship was forming. Clayton also received a text message from Baher "warning" him about Plaintiff, telling him that Plaintiff was the "HR Queens and could not take a joke."

56.     In January or February 2020, at a meeting for the CASC Unit and in front of Plaintiff, Ferrari complimented ADA Siobhan's legs and stated "I hope you didn't take that as sexual harassment" – again mocking Plaintiff and implying that she was oversensitive and that there was no validity to her complaints.

57.     On February 14, 2020, Plaintiff attempted to complete some of her assignments in the office because she had been scheduled very few "office days." Ferrari,

however, told her to work from home and that Muroff (Division Chief) requested that she go home. She had taken paid time off the following week, so she asked her assistant to send her pictures of documents relating to a certain case because she did not have the physical files with her at home. She later found out that there were errors on some of the documents that were sent to her at home, and Ferrari then blamed her for those errors. These errors, however, would not have been made had she been permitted to work from the office and/or if she had been scheduled to work the same number of "office days" as the other ADA's in CASC.

58.     On February 14, 2020, Plaintiff emailed Ferrari about an Adjournment in Contemplation of Dismissal ("ACD"), but Ferrari never responded. Ferrari then reprimanded her for not doing the ACD even though she had ignored her email.

59.     During the week of February 17, 2020, while Plaintiff was out of the office, Ferrari, Hernandez (Deputy Chief), and Kathleen Baer (Supervisor) raided her office without notice and attempted to find information that would suggest she was not handling her cases correctly. They, however, would not have been able to access all of her files without her being there because a lot of her case materials were contained on a program, which only she could access. Ferrari, nevertheless, accused her of mismanaging her cases, and removed her from the "Complaint Room" schedule, making it difficult for her to obtain new cases.

60.     In February 2020, Plaintiff stopped receiving the typical volume of new case assignments for her position. Even when Plaintiff was assigned cases, those cases would quickly be pulled from her after she had completed the preliminary work.

61.     In March 2020, Singer (a non-legal TPA) told Plaintiff in front of her coworkers that "not everything needs to be reported" – implying that she was oversensitive and there was no validity to her sexual harassment and retaliation complaints.

62.     In March 2020, after being diagnosed with Post Traumatic Stress Disorder due to her work environment, and being prescribed medications for anxiety and suicidal ideations, Plaintiff amended her EEO complaint to include that that she was emotionally and mentally deteriorating as a result of the retaliation she was facing at work.

63.     On March 18, 2020, an ADA from the Domestic Violence Unit informed Plaintiff that he had heard rumors that she was going to be transferred to a different unit.

64.     During the beginning of the COVID-19 pandemic in March 2020, others were allowed to work from home the office, while Plaintiff was required to go to Court for arraignment shifts.

65.     On May 8, 2020, during a meeting with the entire CASC Unit, Ferrari joked that "[she was] not being hostile, **at least not this time**," – mocking Plaintiff's claims that she was hostile to her in retaliation for her complaints about Perrotto's sexual harassment. Perrotto, in response, stated "[i]t is May 8 at 2:05 p.m., [Ferrari] is being hostile," – implying that Plaintiff's complaints were baseless and that she found everything to be hostile.

66.     On May 8, 2020, Claimant sent an email to EEO Officers, Nelida Velez, Mary Jo Blanchard and Odalys Alonso, informing them about Ferrari and Perrotto's comments at the meeting that day and that she was being retaliated against for complaining Perrotto's sexual harassment of her.

Religious Discrimination

67.     Plaintiff is of Muslim faith.

68.     Upon information and belief, during the time that Plaintiff has worked for the Bronx DA, there have only been 3 Muslim employees, including Plaintiff, who worked in the CASC unit.

69.     In April 2019, Hiba, a Muslim TPA, informed Plaintiff that the CASC unit "isn't good for people that are not white."

70.     Throughout her employment, Ferrari told Plaintiff that she assigned too much work to TPA's. This surprised Plaintiff because a non-Muslim ADA, Tiffany Ould, had sent TPA Hiba countless emails per weekend and assigned her work that was required to be done by an attorney, as well as assigning her work on her days off, but was not reprimanded for assigning too much work. Additionally, TPA Hiba requested not to work with ADA Ould, but her request was denied.

71.     At the beginning of Plaintiff's employment, she was reprimanded for making a mistake on a subpoena. Ferrari, thereafter, required that all of her work be reviewed by another ADA. Both Perrotto and another Felony Assistant have made mistakes on subpoenas, but neither of them were reprimanded or were required to have their work reviewed because they are not Muslim.

72.     Claimant's TPA, Brandi Delao, often told her that there were a lot of Muslims in the building she lived in and that the building "smelled like Muslims."

73.     Plaintiff did not file formal complaints regarding these comments due to the response, or lack thereof, by Plaintiff's supervisors concerning her previous complaints, as well as the utterly insufficient response of the EEO Officer. Defendants have established a

clear history of not taking Plaintiff's complaints seriously, ignoring, belittling, and making fun of Plaintiff whenever a complaint was filed. Furthermore, when Plaintiff complained about her former TPA Vanessa's treatment of her, Ferrari took her TPA away from Plaintiff and didn't assign her another one.

74.     In approximately June 2019, a non-Muslim TPA alleged that a security guard sexually harassed her. Her complaints were taken seriously because she was not Muslim and the Bronx DA removed him to a different floor, rather than transfer the victim. Plaintiff, on the other hand, was retaliated against and threatened with transfer when she complained about Perrotto's sexual harassment of her because she was Muslim.

75.     In approximately August 2020, Plaintiff requested an accommodation of a quieter office location due to her Attention Deficit Disorder ("ADD"). Three new offices became available shortly thereafter, and were to be assigned based on seniority. However, despite Plaintiff's accommodation request, the three available offices were assigned to three non-Muslim women, two of which were less senior to Plaintiff in the CASC unit and one of which had equal seniority to Plaintiff.

76.     In response to Plaintiff's accommodation request, Plaintiff was allowed to work from home for one year, although she was still required to be present for Forensic Interviewing, court proceedings, and to interview witnesses. This response did not address Plaintiff's disability because she was still in need of a quieter office to complete the in-person assignments such as interviewing witnesses. Additionally, Plaintiff was not supplied any provisions necessary to effectively facilitate her transition to working from home, such as a desk, paper, printer supplies, etc.

77.     Plaintiff was, as a "goodwill gesture," transferred to another office in a noisy section but with air ventilation. After a short period of time, Plaintiff was told that her new office will now be used to house another ADA's computer. No other ADA is situated in such a manner as all other ADAs have their own office.

<u>FIRST CAUSE OF ACTION</u>
SEXUAL HARASSMENT UNDER TITLE VII

78.     Plaintiff repeats every allegation of the preceding paragraphs as if set forth in this cause of action.

79.     At all relevant times, Plaintiff was an "employee" and a "person" within the meaning of Title VII and Defendants were "employers."

80.     Title VII prohibits the creation of a hostile work environment, including sexual harassment. 42 U.S.C. §§ 2000e-2(a)(1) *et seq.*

81.     The facts asserted in this Complaint confirm Plaintiff's work environment was objectively severe and pervasive such that a reasonable person would find it hostile; Shirapova perceived the environment as hostile; and the hostile environment was because of her gender.

82.     Defendants engaged in unlawful employment practices that Title VII prohibits.

83.     As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer, *inter alia*, loss of wages and benefits, emotional distress, mental anguish, emotional pain, physical pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

<u>SECOND CAUSE OF ACTION</u>
GENDER BASED HARASSMENT UNDER THE NEW YORK CITY HUMAN
RIGHTS LAW AS AGAINST ALL DEFENDANTS

84.     Plaintiff realleges every allegation of the preceding paragraphs as if fully set forth herein

85.     At all relevant times, Plaintiff was an "employee" and "person" and Defendants were "employers" under the NYCHRL.

86.     Plaintiff was treated less well than her male colleagues because of her gender, violating N.Y.C. Admin. Code § 8-107(1)(a).

87.     Defendants are strictly liable for the actionable hostile environment created by their supervisors who had immediate or successively higher authority over Plaintiff.

88.     As a result of Defendants' harassment of her, Plaintiff has suffered and continues to suffer, *inter alia*, loss of wages, emotional distress, mental anguish, emotional pain and suffering, inconvenience, and loss of enjoyment of life.

89.     Defendants harassed and discriminated against Plaintiff with malice and reckless indifference to her rights under the NYCHRL.

90.     As a result of Defendants' unlawful conduct, Plaintiff can recover punitive damages against Defendants. N.Y.C. Admin. Code § 8-502.


<u>THIRD CAUSE OF ACTION</u>
SEXUAL HARASSMENT UNDER NEW YORK STATE HUMAN RIGHTS LAW AS
AGAINST ALL DEFENDANTS

91.     Plaintiff realleges every allegation of the preceding paragraphs as if fully set forth herein.

92.     At all relevant times, Plaintiff was an "employee" and "person" and Defendants were "employers" under the NYSHRL.

93.     The NYSHRL prohibits employment discrimination and harassment based on gender. N.Y. Exec. Law § 296(1)(a).

94.     Plaintiff was subjected to unwelcomed sexual conduct in the workplace that constitutes sex-based harassment.

95.     Defendants' work place was permeated with discrimination that was sufficiently severe and pervasive to alter the conditions of Plaintiff's work environment and create an abusive working environment.

96.     Defendants are vicariously liable for an actionable hostile and discriminatory environment created by their supervisors who had immediate or successively higher authority over Plaintiff.

97.     As a result of Defendants' harassment of her, Plaintiff has suffered and continues to suffer, *inter alia*, loss of wages, emotional distress, mental anguish, emotional pain and suffering, inconvenience, and loss of enjoyment of life.

98.     Defendants harassed Plaintiff with malice and/or reckless indifference to her rights under the NYSHRL.

99.     As a result of Defendants' unlawful conduct, Plaintiff can recover punitive damages against Defendants.

FOURTH CAUSE OF ACTION
RELIGIOUS DISCRIMINATION UNDER TITLE VII

100.    Plaintiff repeats every allegation of the preceding paragraphs as if set forth in this cause of action

101.    Title VII prohibits discrimination on the basis of religion. 42 U.S.C. §§ 2003-2(a)(1), *et seq.*

102.    Defendants discriminated against Plaintiff on the basis of her religion.

103.    As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer, *inter alia*, loss of wages and benefits, emotional distress, mental anguish, emotional pain, physical pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

FIFTH CAUSE OF ACTION
RELIGIOUS DISCRIMINATION UNDER THE NEW YORK CITY HUMAN RIGHTS
LAW

104.    Plaintiff repeats every allegation of the preceding paragraphs as if set forth in this cause of action

105.    At all relevant times, Plaintiff was an "employee" and a "person" within the meaning of the NYCHRL and Defendants were "employers."

106.    Plaintiff is of Muslim faith, a religion protected under the NYCHRL.

107.    Defendants were aware of Plaintiff's religion.

108.    Defendants treated Plaintiff less well than her non-Muslim co-workers because of her religious beliefs, customs and observances.

109.    As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer, *inter alia*, loss of wages and benefits, emotional distress, mental anguish, emotional pain, physical pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

## SIXTH CAUSE OF ACTION
### RELIGIOUS DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

110.    Plaintiff repeats every allegation of the preceding paragraphs as if set forth in this cause of action.

111.    At all relevant times, Plaintiff was an "employee" and a "person" within the meaning of the NYSHRL and Defendants were "employers."

112.    Plaintiff is of Muslim faith, a religion protected under the NYSHRL.

113.    Defendants were aware of Plaintiff's religion.

114.    Defendants treated Plaintiff less well than her non-Muslim co-workers because of her religious beliefs, customs and observances.

115.    As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer, *inter alia*, loss of wages and benefits, emotional distress, mental anguish, emotional pain, physical pain and suffering, inconvenience, loss of enjoyment of life and medical expenses.

## SEVENTH CAUSE OF ACTION
### RETALIATION UNDER TITLE VII

116.    Plaintiff repeats every allegation of the preceding paragraphs as if set forth in this cause of action.

117.     Under Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. §§ 2003-3(a).

118.     Plaintiff engaged in protected activity: rejecting Perrotto's sexual harassment and complaining about it.

119.     Defendants were aware of Plaintiff's participation in the protected activity; they took adverse action against Plaintiff; and a causal connection existed between Plaintiff's protected activity and the adverse action Defendants took.

120.     No legitimate, non-retaliatory reasons exist for the adverse action Defendants took against Plaintiff.

EIGHTH CAUSE OF ACTION
UNLAWFUL RETALIATION UNDER NEW YORK CITY HUMAN RIGHTS LAW
AS AGAINST ALL DEFENDANTS

121.     Plaintiff realleges every allegation of the preceding paragraphs as if fully set forth herein.

122.     The NYCHRL prohibits employers from retaliating or discriminating in any manner against any person because such person has opposed any practice the NYCHRL forbids. N.Y.C. Admin. Code § 8-107(7).

123.     Under the NYCHRL, the retaliation or discrimination complained of need not result in an "ultimate action" with respect to the employee, or even in a materially adverse change in the employee's terms and conditions, provided that the retaliatory or discriminatory act(s) complained of would be reasonably likely to deter a person from

engaging in protected activity. Restoration Act § 3 (amending N.Y.C. Admin. Code § 8-107(7)).

124.    Plaintiff took action to oppose Defendants' hostile work environment by complaining of the harassment Plaintiff faced.

125.    Defendants engaged in conduct that was reasonably likely to deter a person from engaging in such conduct, violating the NYCHRL's anti-retaliation provision. N.Y.C. Admin. Code § 8-107(7).

126.    A causal connection exists between Plaintiff's complaints and Defendants' retaliatory conduct.

NINTH CAUSE OF ACTION
RETALIATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

127.    Plaintiff realleges every allegation of the preceding paragraphs as if fully set forth herein.

128.    Under the NYSHRL, "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer . . . to . . . discriminate against any person because [s]he has opposed any practices forbidden under this article or because [s]he has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(1)(e).

129.    Plaintiff engaged in protected activity, having opposed and complained about practices the NYSHRL forbids; Defendants' were aware of Plaintiff's participation in the protected activity; Defendants took adverse action against Plaintiff; and a causal connection existed between Plaintiff's protected activity and the adverse action Defendants took.

130.   No legitimate, non-retaliatory reasons exist for the adverse action Defendants took against Plaintiff.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

a.   Accepts jurisdiction over this matter;

b.   Impanels and charges a jury with respect to the causes of action;

c.   Compensatory damages including, but not limited to, damages for pain and suffering, anxiety, humiliation, loss of enjoyment of life, emotional distress in order to compensate her for the injuries she has suffered and to signal to other employers that discrimination, harassment, and retaliation are repulsive to legislative enactments in an amount of at least $500,000.00;

d.   An award of punitive damages under Title VII, NYCHRL, and NYSHRL, in an amount of at least $2,000,000.00;

e.   An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

f.   Such other and further relief as this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions

of fact the Complaint raises.

Dated: New York, New York
       November 18, 2020

LIPSKY LOWE LLP


<u>/s/ Christopher Lowe</u>
Christopher Lowe
Alfons D'Auria
420 Lexington Avenue, Suite 1830
New York, New York 10170-1830
Tel: 212.392.4772
Fax: 212.444.1030
chris@lipskylowe.com
alfons@lipskylowe.com